NO. 14-3249

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT**

_____

**DANIEL WAYNE CLAY,**
**Plaintiff-Appellant,**

**v.**

**UNITED PARCEL SERVICE, INC.,**
**Defendant-Appellee.**

_____

**On Appeal from the United States District Court
for the District of Kansas, Judge Sam A. Crow**

**District Court Case No. 13-2240-SAC**

_____

**BRIEF OF APPELLEE UNITED PARCEL SERVICE, INC.**

_____

**Dione C. Greene**
**ARMSTRONG TEASDALE LLP**
**2345 Grand Boulevard, Suite 1500**
**Kansas City, Missouri 64108-2617**
**Telephone:  (816) 221-3420**
**Facsimile:  (816) 221-0786**

**Attorneys for Defendant-Appellee**

**ORAL ARGUMENT NOT REQUESTED**

## CORPORATE DISCLOSURE STATEMENT OF APPELLEE

Appellee United Parcel Service, Inc. ("UPS"), pursuant to F.R.A.P. 26.1, states there is no parent corporation for UPS, and there is no publicly held corporation that owns ten percent or more of UPS's stock.

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT OF APPELLEE .............................i

TABLE OF CONTENTS........................................................................ ii

TABLE OF AUTHORITIES ...............................................................iv

PRIOR OR RELATED APPEALS........................................................ vii

JURISDICTIONAL STATEMENT .......................................................1

STATEMENT OF ISSUES ON APPEAL ...............................................2

STATEMENT OF THE CASE.............................................................3

STATEMENT OF FACTS ...................................................................4

     Plaintiff's First Termination for Workplace Violence .......................5

     Plaintiff's Second Termination for Workplace Violence...........................7

     Plaintiff's Third Termination for Workplace Violence..................................8

     Plaintiff's Fourth Termination for Workplace Violence................................9

     Plaintiff's Fifth and Final Termination for Workplace Violence...................9

SUMMARY OF ARGUMENT .............................................................14

ARGUMENT ....................................................................................15

I.    The standard of review on appeal...............................................15

II.   The District Court properly granted UPS's motion for summary judgment on plaintiff's claims....................................................15

     A.    42 U.S.C. § 1981 .............................................................16

     B.    Even if plaintiff could make a prima facie case, he cannot show that UPS's reason for terminating him is pretextual. ..........................18

     C.    Racial Harassment...........................................................19

III.    The District Court did not abuse its discretion by denying plaintiff's motion for appointment of counsel.................................................................25

IV.    The District Court properly considered UPS's witness statements because plaintiff stipulated to the admissibility of the statements and UPS relied on them to terminate plaintiff.......................................................27

V.    The District Court did not abuse its discretion in denying plaintiff's request for default. ...........................................................................................28

CONCLUSION ........................................................................................................29

CERTIFICATE OF COMPLIANCE ......................................................................30

CERTIFICATE OF DIGITAL SUBMISSION .......................................................31

CERTIFICATE OF SERVICE ...............................................................................31

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Barlow v. C.R. England, Inc.*, 703 F.3d 497 (10th Cir. 2012) ..................................15

*Bolden v. PRC, Inc.*, 43 F.3d 545 (10th Cir. 1995).....................................22, 23, 24

*Castner v. Colorado Springs Cabelvision*, 979 F.2d 1417, 1420 (10th Cir. 1992) ......................................................................................... 25, 27

*Chavez v. New Mexico*, 397 F.3d 826 (10th Cir.2005)................................................23

*Coleman v. Miller*, 885 F.Supp. 1561 (N.D.Ga.1995), *aff'd*, 117 F.3d 527 (11th Cir.1997).............................................................................21

*Cookish v. Cunningham*, 787 F.2d 1, 4 (10th Cir. 1986).........................................26

*Dennis Garberg & Assocs., Inc. v. Pack–Tech Int'l Corp.*, 115 F.3d 767, 771 (10th Cir.1997) ............................................................29

*Erickson v. City of Topeka*, 209 F. Supp. 2d 1131 (D. Kan. 2002) ........................22

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) ............................................20

*Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1434-35 (10th Cir. 1993).................................................................................................28

*Ford v. West*, 222 F.3d 767, 775 (10th Cir. 2000)....................................................19

*Gaff v. St. Mary's Reg'l Med. Ctr.*, 506 Fed. Appx. 726, 729 (10th Cir. 2012) .........................................................................................18

*Gulley v. Orr*, 905 F.2d 1383, 1386 (10th Cir. 1990)..............................................29

*Harsco Corp. v. Renner*, 475 F.3d 1179 (10th Cir.2007) .......................................23

*Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675 (10th Cir. 2007) ...............................19

*Kendrick v. Penske Trans. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000) .................................................................................... 16, 18

*MacKenzie v. City and County of Denver,* 414 F.3d 1266 (10th Cir. 2005)................................................................................................24

*McNeil v. Kennecott Holdings*, 381 Fed. Appx. 791 (10th Cir. 2010) ....................24

*Moomchi v. Univ. of New Mexico*, 72 F.3d 138 (10th Cir. 1995)............................27

*Morris v. City of Colorado Springs*, 666 F.3d 654, 660 (10th Cir. 2012)................................................................................................15

*Plotke v. White,* 405 F.3d 1092 (10th Cir. 2005). .........................................16

*Rhodes v. Guiberson Oil Tools*, 75 F.3d 989 (5th Cir.1996)..........................16

*Roberts v. Paulson*, 263 Fed. Appx. 745, 748 (10th Cir. 2008) (unpublished)............................................................................29

*Salguero v. City of Clovis,* 366 F.3d 1168 (10th Cir. 2004) .....................................16

*Sandle v. Principi*, 201 Fed. Appx. 579, 583 (10th Cir. 2006) (unpublished)............................................................................25

*Sandoval v. City of Boulder,* 388 F.3d 1312 (10th Cir. 2004) .................................19

*Tademy v. Union Pacific Corp.*, 614 F.3d 1132 (10th Cir. 2008) .................... 20, 21

*Walker v. R.L. Brownlee*, 385 F. Supp.2d 1126 (D. Kan. 2005) ...........................20

*Witt v. Roadway Express*, 136 F.3d 1424, 1432 (10th Cir. 1998) ...........................19

*Wright-Simmons v. The City of Oklahoma City*, 155 F.3d 1264, 1269 (10th Cir. 1998)..............................................................28

*Zamora v. Bd. of Educ. for Las Cruces Pub. Sch.*, 553 Fed. Appx. 786, 788 (10th Cir. 2014)............................................................28

**Statutes**

28 U.S.C. §1291 ......................................................................................1

28 U.S.C. §1331 ......................................................................................1

42 U.S.C. §1981 ......................................................................................1

42 U.S.C. §2000e ....................................................................................1

**Rules**

F.R.A.P. 4(a)(1)(A) ...................................................................................................1

FED. R. CIV. P. 56 ...................................................................................................15

## PRIOR OR RELATED APPEALS

There are no prior or related appeals.

## JURISDICTIONAL STATEMENT

The United States District Court of Kansas had subject matter jurisdiction over Daniel W. Clay's lawsuit against UPS pursuant to 28 U.S.C. §1331, because his Complaint alleged claims for racial discrimination under § 1981 and racial harassment under 42 U.S.C. §1981 and Title VII of the Civil Rights Act, 42 U.S.C. §2000e, *et seq*. ("Title VII").

On October 15, 2014, the District Court entered a Memorandum and Order granting UPS's Motion for Summary Judgment.  On October 15, 2014, the Clerk of the District Court entered Judgment in accordance with the District Court's Memorandum and Order.  (Vol. I of Record, at 494). [1]  On November 7, 2014, Mr. Clay timely filed his notice of appeal in accordance with F.R.A.P. 4(a)(1)(A).  This Court, therefore, has jurisdiction over this appeal pursuant to 28 U.S.C. §1291.

---

[1] The citations to the Record on Appeal in this brief refer to Volume (Vol.) I of the record (which includes summary judgment briefing, exhibits, and the District Court's Memorandum and Order granting summary judgment) filed by the Clerk of Court on November 12, 2014.

1

## STATEMENT OF ISSUES ON APPEAL

I.      Whether the District Court properly granted UPS's motion for summary judgment when the plaintiff (1) failed to timely respond to UPS's motion for summary judgment and (2) failed to present evidence supporting his claims or in responding to UPS's motion for summary judgment.

II.      Whether the District Court abused its discretion in denying plaintiff's motion for appointment of counsel.

III.      Whether the District Court erred in denying plaintiff's motion to strike UPS's witness statements used to support its motion for summary judgment when (1) plaintiff stipulated to the admissibility of the statements in the pretrial order and (2) the statements were relied on by UPS in terminating plaintiff.

IV.      Whether the District Court abused its discretion in denying plaintiff's request for default judgment when (1) UPS timely filed an answer and (2) plaintiff suffered no prejudice.

## STATEMENT OF THE CASE

Plaintiff/Appellant has a history of workplace violence.  UPS terminated him on four different occasions for threatening or attempting to fight co-workers. Through a grievance process, UPS and plaintiff's union agreed to reduce the terminations to suspensions.  Plaintiff, however, was required to see a licensed psychologist and attend an 8-week anger management seminar.  Nevertheless, four terminations, psychological therapy, and an 8-week anger management seminar did not stop plaintiff from following a co-worker at 3:30 a.m. in March 2013 in UPS's parking lot to start a fight.  After an investigation, plaintiff was terminated a fifth time for workplace violence.  This time, however, his termination was final.

Plaintiff sued UPS alleging racial discrimination under § 1981 and racial harassment under § 1981 and Title VII.  UPS filed a motion for summary judgment.  Plaintiff failed to timely respond to UPS's motion, failed to provide any evidence of discrimination or harassment, and further failed to dispute any of UPS's statement of facts.  The District Court granted UPS's motion for summary judgment.  The District Court's judgment should be affirmed.

## STATEMENT OF FACTS

On January 12, 2004, Darrell Abels, UPS Trailer Shop Manager, hired plaintiff as a utility worker for its Lenexa, Kansas facility; plaintiff worked in that position throughout the duration of his employment.  (Vol. I, at 240, Pl. Dep., 20: 21-25; Vol. I, at 244-245, Pl. Dep., 27:8-28:1).   His responsibilities included washing, undercoating, sanding, and painting trailers.  (Vol. I, at 240, 244-45, Pl. Dep., 20:21-25; Vol. I, at 244-245, 27:8-28:1; Vol. I, at 323, Abels Declaration (Dec.), ¶ 6).

None of plaintiff's supervisors or managers ever called him any racist names.  (Vol. I, at 317-318, Pl., Dep., 281-282:11).  UPS management did not bother plaintiff with respect to the terms and conditions of his employment.  (Vol. I, at 246-247, Pl. Dep., 29:24-30:6).  According to plaintiff, he worked well with all his co-workers. (Vol. I, at 306, Pl. Dep., 252:16-22). Plaintiff also joked a lot with co-workers, calling one co-worker a "Mexican" who "wasn't no Mexican." (Vol. I, at 256, Pl. Dep., 61:7-12; Vol. I, at 287, Pl. Dep., 196:13-14).

### Plaintiff's Training on UPS's Professional Conduct and Anti-Harassment Policy

UPS has a Professional Conduct and Anti-Harassment Policy (Policy), which expressly prohibits workplace violence, harassment and discrimination. (Vol. I, at 250-251, Pl. Dep., 41:24-42:12); (Vol. I, at 364 Policy (UPS 584)).  The Policy says: "UPS prohibits violent behavior including, but not limited to, physical

4

assaults, fighting, threatening comments, and intimidation. . . . Any comments or behavior that could be reasonably interpreted as an intent to do harm to people or property will be considered a threat." (Vol. I, at 365, Training doc. signed by plaintiff (UPS 585)).

UPS conducts training on the Policy with its employees annually and as needed. (Vol. I, at 250-251, Pl. Dep., 41:24-42:12); (Vol. I, at 324, Abels Dec., ¶8). Plaintiff was trained on several occasions regarding UPS's policy prohibiting workplace violence, and specifically advised during training that any comments or behavior that reasonably could be interpreted as an intent to do harm to people would be considered a threat. (Vol. I, at 248-249, Pl. Dep., 39-40); (Vol. I, at 357, Training doc. signed by plaintiff (UPS 419-420)); (Vol. I, at 251-252, Pl. Dep., 42-43); (Vol. I, at 324, Abels' Dec., ¶ 10); (Vol. I, at 252, Pl. Dep., 43:9-16); (Vol. I, at 324, Abels' Dec., ¶ 11); (Vol. I, at 366, (UPS 586)); (Vol. I, at 254-255, Pl. Dep., 48:4-49:11); (Vol. I, at 365, Training doc. signed by plaintiff (UPS 585)). Plaintiff understood that "UPS has a zero-tolerance regarding workplace violence." (Vol. I, at 253, Pl. Dep., 46:1-5).

### Plaintiff's First Termination for Workplace Violence

In September 2009, Ellen Marlier (automotive repair trainer), reported to Darrell Abels that plaintiff said "white people are all the same," "women are all bitches," that he would "fix" certain employees, and that plaintiff "tried to

intimate me by telling me he had shot someone" after an argument.  (Vol. I, at

355 , Marlier Statement (UPS 416)); (Vol. I, at 325, Abels' Dec., ¶¶ 17, 18).  Mr.

Abels spoke with plaintiff about the concerns.  Plaintiff stated he was a "paranoid

schizophrenic," and he refused to provide the names of individuals with whom he

had a problem.  (Vol. I, at 325, Abels' Dec., ¶ 20); (Vol. I, at 261, Pl. Dep., 80:7-

10); (Vol. I, at 262-263, Pl. Dep., 81:21-82:6).  Mr. Abels terminated plaintiff for

violating UPS's policy against workplace violence.  (Vol. I, at 325, Abels' Dec., ¶

23); (Vol. I, at 354, Pl. Sept. 2009 Termination (UPS 415)).

Grievance Proceeding for First Workplace
Violence Termination

Plaintiff was a member of the International Brotherhood of Teamsters, and

entitled to file grievances.  (Vol. I, at 326, Abels' Dec., ¶ 24); (Vol. I, at 257, Pl.

Dep., 63).  UPS and the union agreed to reduce plaintiff's termination to a

suspension, but plaintiff had to first be psychologically evaluated by a mental

health professional.  (Vol. I, at 265-266, Pl. Dep., 118:7-119:7); (Vol. I, at 326,

Abels' Dec., ¶ 27); (Vol. I, at 267, Pl. Dep., 126:8-12); (Vol. I, at 360,

Psychologist Ltr. (UPS 435)).

Upon plaintiff's return to work, he complained to Darrell Abels that Ms.

Marlier had a confederate flag license plate in her rear window of her vehicle.

(Vol. I, at 314, Pl., Dep., 275:1-25); (Vol. I, at 326, Abels' Dec., ¶ 29).  Mr. Abels

investigated the complaint and had a discussion with Ms. Marlier about the license

6

plate, and she indicated that she just liked the flag and did not mean for it to be offensive.  (Vol. I, at 326-327, Abels' Dec., ¶ 30).  It did not appear to Mr. Abels that Ms. Marlier harbored any racial animus or intended to offend any employees. Had Ms. Marlier displayed racially offensive language, Mr. Abels would have disciplined her.  (Vol. I, at 326-327, Abels' Dec., ¶ 30).  Mr. Abels concluded that Ms. Marlier did not violate UPS policies by having a personal license plate in her rear window in her vehicle, and he informed Mr. Clay of the same.   (Vol. I, at 326-327, Abels' Dec., ¶ 30).

### Plaintiff's Second Termination for Workplace Violence

On March 10, 2011, several employees reported that plaintiff called a female co-worker a "fucking old woman" and that he stood chest to chest ready to fight an African American male co-worker.  (Vol. I, at 347-348, Investigative Report (UPS 371-72)).  After conducting witness interviews, manager Gayle Ferguson (African-American) terminated plaintiff for workplace violence.    (Vol. I, at 349, Investigative Reports (UPS 373)); (Vol. I, at 242,  250 and 277, Pl. Dep. 22:1-3; 41:14-18; 160:11-14).  UPS and the union later agreed to reduce his termination to a suspension.  (Vol. I, at 327, Abels' Dec., ¶ 36); (Vol. I, at 278-279, Pl. Dep., 171:7-172:17).

## Plaintiff's Third Termination for Workplace Violence

On April 11, 2011, upon plaintiff's return to work, management reviewed and trained him and all other employees on UPS's professional conduct and anti-harassment policies. (Vol. I, at 280, Pl. Dep., 174:3-21); (Vol. I, at 353, Workplace Violence Prev. Policy (UPS 388)); (Vol. I, at 328 Abels' Dec., ¶ 39); (Vol. I, at 281, Pl. Dep., 176:1-10).

Within one hour after the training, plaintiff was terminated for confronting a co-worker in a threatening manner.  (Vol. I, at 328, Abels' Dec., ¶ 40); (Vol. I, at 328, Abels' Dec., ¶ 43); (Vol. I, at 282, Pl. Dep., 180:14-25).  Plaintiff filed a grievance, and with the assistance of his union, his termination was ultimately reduced to a suspension.  (Vol. I, at 328, Abels' Dec., ¶ 44).

### Plaintiff's Co-Worker Terminated for
### Inappropriate Comment

Mr. Abels subsequently learned that Louis Kronawitter (plaintiff's co-worker) told a union steward that to "have a talk with your boy," referring to plaintiff. (Vol. I, at 328, Abels' Dec., ¶ 45).  Although plaintiff never heard or complained about the comment, Mr. Abels terminated Mr. Kronawitter (Caucasian) for making the comment.  (Vol. I, at 328, Abels' Dec., ¶ 45).  Mr. Abels had also previously terminated Marvin Green (a Caucasian employee) for engaging in a verbal confrontation with a co-worker.  (Vol. I, at 329, Abels' Dec., ¶ 47).

8

**Plaintiff's Fourth Termination for Workplace Violence**

On September 6, 2012, during a communications meeting, plaintiff jumped up, told a co-worker, "Fuck you, you wanna go," and marched towards the co-worker to fight. (Vol. I, at 286, Pl., Dep., 195:1-13); (Vol. I, at 337, Leone Statement (UPS 290)); (Vol. I, at 338, Watts Statement (UPS 291)).    Manager James Francis (African American) terminated plaintiff for workplace violence. (Vol. I, at 367, Termination Ltr. (UPS 591)); Ex.   (Vol. I, at 374, Francis Dec., ¶ 20).   Plaintiff's termination was eventually reduced to a suspension, but UPS and plaintiff's union gave him a <u>final warning</u> and required him to attend an <u>8-week</u> anger management seminar.   (Vol. I, at 343-344, Panel Decision (UPS 336-337)); (Vol. I, at 293-294, Pl., Dep., 217-219). (Vol. I, at 345, Anger Management Cert. (UPS 339)).

**Plaintiff's Fifth and Final Termination for Workplace Violence**

On March 7, 2013, around 6:20 p.m., Carlo Leone, automotive supervisor, conducted a meeting with the workforce.  He informed them that he would perform a fire alarm test, and the group should go outside in the parking lot.  (Vol. I, at 298-299 and 302, Pl., Dep., 223: 24-224:10; 233:21-24).   Mr. Leone rang the fire alarm.  When he arrived outside in the parking lot, he saw "Daniel Clay and [co-worker] Pascal Kinsey walking about 10 feet apart towards the meet point." (Vol. I, at 334, Leone Statement (UPS 280)).   Mr. Leone heard Mr. Kinsey (African

American) "tell Daniel to leave him alone and stay away from him." (Vol. I, at 334, Leone Statement (UPS 280)).

Mr. Leone told them "knock the playing off before somebody gets serious." Plaintiff then "walked on to the other side of the parking lot," while Mr. Kinsey "went to one side" and plaintiff "stayed away from the guy." (Vol. I, at 300, Pl., Dep., 230:10-15). After the fire drill, all the employees walked back in the building. (Vol. I, at 301-302, Pl., Dep., 232:15-233:4).

When the work shift ended at 3:30 a.m., several employees went outside to warm up their cars. (Vol. I, at 333, Johnson Statement (UPS 275)). According to Joel Johnson (African American Fleet Supervisor), Mr. Kinsey suddenly returned in the building and reported that plaintiff threatened him in the parking lot. After the shift ended, when Mr. Kinsey went to warm up his car, plaintiff followed him and told Mr. Kinsey that he was going to knock him out. (Vol. I, at 333, Johnson Statement (UPS 275)).

Mr. Johnson looked outside and confirmed that plaintiff was no longer in the parking lot. He then followed Mr. Kinsey out the door and watched him safely get into his vehicle. Mr. Johnson then reported Mr. Kinsey's complaint to James Francis, and an investigation followed. (Vol. I, at 333, Johnson Statement (UPS 275)).

<u>Investigation and Final Termination</u>

James Francis, Scott Karr (security manager), and other management representatives conducted a series of witness interviews (which included plaintiff). (Vol. I, at 330-32, Investigation Report (UPS 266-268)).  Mr. Kinsey reported:

> At the end of the shift at 3:30 a.m., I proceeded to walk out to warm up my vehicle.  [Plaintiff] walked outside and said "It's 3:30 nig** so now what's up.  I said, "You need to get in your car and go home.  I'm not going to lose my job fooling with you."  So I started my vehicle and he was sitting in his vehicle waiting.  I walked back inside [and] told Joel that he was outside waiting to fight me.

(Vol. I, at 336, Kinsey Statement (UPS 282)).

Kenneth Stuteville, plaintiff's co-worker was also interviewed.  He reported that plaintiff and Mr. Kinsey exchanged words during the meeting.  (Vol. I, at 331, Investigation Report (UPS 267)).  Plaintiff and Mr. Kinsey continued exchanging words during the fire drill, until Mr. Leone told them to stop.  When the shift resumed, Mr. Stuteville observed that plaintiff "was still upset with Pascal [Kinsey]."  (Vol. I, at 331, Investigation Report (UPS 267)).  Mr. Stuteville told plaintiff to "let it go or drop it."  Mr. Stuteville further reported that around 3:30 a.m., when they left the building, "Daniel made comments to Pascal outside trying to get him to fight."  Mr. Stuteville heard plaintiff say "it was 3:30 now let's fight, let's do this!"  (Vol. I, at 331, Investigation Report (UPS 267)).  Plaintiff admits

11

that UPS terminated him based on Mr. Stuteville's statements. (Vol. I, at 361-363, Stuteville Statements (UPS 575-577)); (Vol. I, at 305, Pl. Dep. 246:11-16).

James Francis (African American) terminated plaintiff. Mr. Francis relied on multiple witness interviews, the investigation report, and witness statements. (Vol. I, at 376-377, Francis Dec., ¶ 34). In terminating plaintiff, Mr. Francis also took in account plaintiff's previous four terminations and his history of workplace violence. (Vol. I, at 376-377, Francis Dec., ¶ 34).

<u>Grievance Proceedings</u>

On March 18, 2013, Mr. Clay filed a grievance contesting his termination. (Vol. I, at 368-370, Grievance (UPS 812-814)); (Vol. I, at 309-312, Pl., Dep., 269-272). A local hearing was held, attended by Jeremiah Gibson (union steward), Clint Long (union steward), James Francis, and Jerry Wassel (labor manager). (Vol. I, at 313, Pl., Dep., 273:1-2); (Vol. I, at 377, Francis Dec., ¶ 36).

Contesting his termination, plaintiff complained that four years prior Ellen Marlier had a confederate flag license plate in the rear window of her car. (Vol. I, at 377, Francis Dec., ¶ 37). Plaintiff's union steward, Clint Long, then told plaintiff that UPS could not control what employees placed on their personal property in the parking lot. According to plaintiff, Mr. Long "said you could have a Black Panther sticker and they can't do nothing about it." (Vol. I, at 316 , Pl., Dep., 278:17-19); (Vol. I, at 377, Francis Dec., ¶ 38). According to plaintiff, Mr.

12

Wassel then "chimed in and came up with, You can have a Black Panther sticker." (Vol. I, at 316, Pl., Dep., 278:17-21).  Plaintiff never complained to either Darrel Abels or James Francis about racial harassment or offensive language on the radio. (Vol. I, at 319, Pl., Dep., 285:18-21);  (Vol. I, at 329, Abels' Dec., ¶ 46); (Vol. I, at 377, Francis Dec., ¶ 39).  Plaintiff's grievance was ultimately denied.  (Vol. I, at 378, Francis Dec., ¶ 40).

# SUMMARY OF ARGUMENT

UPS terminated plaintiff on four different occasions for threatening or attempting to fight co-workers.  Through a grievance process, UPS and plaintiff's union agreed to reduce the terminations to suspensions.  Plaintiff, however, was required to see a licensed psychologist and attend an 8-week anger management seminar.  Nevertheless, four terminations, psychological therapy, and an 8-week management seminar did not stop plaintiff from later following a co-worker during the night outside in UPS's parking lot to fight.  After an investigation, plaintiff was terminated a fifth time for workplace violence.  This time his termination was final.

Plaintiff's allegations of racial discrimination and harassment under Title VII and § 1981 fail.  Plaintiff failed to provide any evidence of discrimination or harassment.  He did not dispute any of UPS's statement of facts.  Plaintiff admitted that UPS terminated him based on witness observations that he attempted to fight a co-worker.  No reasonable jury would rule in favor of plaintiff.  The District Court's judgment should be affirmed.

## ARGUMENT

### I.    The standard of review on appeal.

Appellate courts review a district court's grant of summary judgment *de novo*, applying the same standard as the district court.  *Morris v. City of Colorado Springs*, 666 F.3d 654, 660 (10th Cir. 2012).   Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  *See* FED. R. CIV. P. 56.

### II.    The District Court properly granted UPS's motion for summary judgment on plaintiff's claims.

Plaintiff had no direct evidence of racial discrimination.  Without direct proof, a plaintiff in a race termination case must rely on the three-part, burden-shifting framework set out by the Supreme Court in *McDonnell Douglas*.   *See Barlow v. C.R. England, Inc.*, 703 F.3d 497, 505 (10th Cir. 2012).   Under this framework, the plaintiff must first put forth a prima facie case of discrimination.  *See id*.  Only after the plaintiff clears this initial hurdle does the burden shift to the employer to prove a "legitimate, non-discriminatory reason for the adverse employment action." *Id.*  "If the plaintiff does not establish a prima facie case, his entire case fails."  *Barlow*, 703 F.3d at 505.

"The critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination." *Plotke v. White,* 405 F.3d 1092, 1100 (10th Cir. 2005). Most generally, a plaintiff must demonstrate: "(1) he was a member of a protected class; (2) he was qualified and satisfactorily performing his job; and (3) he was terminated under circumstances giving rise to an inference of discrimination." *Salguero v. City of Clovis,* 366 F.3d 1168, 1175 (10th Cir. 2004).

## A.    42 U.S.C. § 1981

Plaintiff presented no evidence that his final termination was under circumstances giving rise to an inference of racial discrimination. First, plaintiff admits that Mr. Francis terminated him based on witnesses observations that plaintiff attempted to fight Mr. Kinsey. (Vol. I, at 305, Pl. Dep., 246:11-16). On this basis alone, plaintiff's claim fails.

Second, James Francis, who made the final termination decision, is African American. *Cf. Kendrick v. Penske Trans. Servs., Inc.*, No. 98-2289-KHV, 1999 WL 450886, at * 8 (D. Kan. April 13, 1999) (explaining that "a plaintiff may have difficulty establishing discrimination where the alleged discriminatory decision-maker is in the same protected class"); *Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 1002 (5th Cir.1996) (proof that all decisionmakers were members of the same

race as complaining employee considerably undermines probability that race was a factor in employment decision).

Third, plaintiff cannot show that he was treated differently or worse than other workers outside his protected class.  Plaintiff was terminated by an African American, Mr. Francis, for attempting to fight a co-worker (Pascal Kinsey), who was also African American. (Vol. I, at 376-377, Francis Dec.,¶ 34).  Plaintiff has no evidence that preferential treatment was ever given to white employees.  In fact, UPS provided evidence that Caucasian employees were terminated for violating UPS's policy against workplace violence. (Vol. I, at 329, Ables Dec., ¶ 47; Vol. I, 328, Ables Dec., ¶ 45).

Plaintiff's purported belief that UPS's authority to discipline did not extend to the parking lot is inconsistent with his conduct.  Just prior to his termination, he was warned to stay away from Mr. Kinsey and stop arguing in the parking lot. (Vol. I, at 300-302, Pl. Dep., 230-233).  Plaintiff testified that he (plaintiff) then "just walked on to the other side of the parking lot," while Mr. Kinsey "went to one side and I stayed away from the guy."  (Vol. I, at 300-302, Pl., Dep., 230-233). Plaintiff's conduct in following his supervisor's instruction to stop arguing in the parking lot is an admission that plaintiff was aware that UPS had authority to discipline employees for workplace violence in the parking lot.

Finally, plaintiff cannot show that his final termination was suspect. Plaintiff had a history of workplace violence. (Vol. I, at 373-374, Francis Dec., ¶¶ 11-14). Because of his history of workplace violence, plaintiff was evaluated by a licensed psychologist, had to attend an 8-week anger management seminar, and was given a final warning. (Vol. I, at 343, Panel Decision (UPS 336)). Nevertheless, on March 8, 2013, plaintiff engaged in another act of workplace violence. He followed his co-worker to his car to fight. UPS then terminated him. (Vol. I, at 375-376, Francis Dec., ¶ 28). Based on these undisputed facts, plaintiff cannot establish a prima facie case that he was terminated under circumstances giving rise to an inference of discrimination. Accordingly, the District Court's judgment should be affirmed.

**B.    Even if plaintiff could make a prima facie case, he cannot show that UPS's reason for terminating him is pretextual.**

James Francis terminated plaintiff for violating UPS's policy against workplace violence. (Vol. I, at 376-377, Francis Dec. ¶34). Mr. Francis took into account plaintiff's history of workplace violence in making his decision. (Vol. I, at 376-377, Francis Dec. ¶34). Workplace violence is a legitimate non-discriminatory reason. *See Gaff v. St. Mary's Reg'l Med. Ctr.*, 506 Fed. Appx. 726, 729 (10th Cir. 2012) (defendant "offered a legitimate, non-retaliatory reason for firing [plaintiff] – her threat of violence against a fellow employee"); *Kendrick v. Penske Trans. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000) (defendant met

burden of providing a facially nondiscriminatory reason for firing plaintiff based on plaintiff's verbal abuse and physical contact with supervisor).  Furthermore, plaintiff admitted that UPS terminated him by relying on witness observations that he attempted to fight his co-worker.  (Vol. I, at 305, Pl. Dep., 246:11-16).  Because plaintiff cannot show pretext, his claim fails.

### C. Racial Harassment

A discrimination claim based on a hostile work environment is cognizable under both Title VII and § 1981. *See Ford v. West*, 222 F.3d 767, 775 (10th Cir. 2000) (Title VII); *Witt v. Roadway Express*, 136 F.3d 1424, 1432 (10th Cir. 1998) (§ 1981). To survive summary judgment on a claim alleging a racially hostile work environment, plaintiff "must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and that the victim was targeted for harassment because of his race or national origin." *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007), quoting *Sandoval v. City of Boulder,* 388 F.3d 1312, 1326–27 (10th Cir. 2004).

"The run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces is not the stuff of a Title VII hostile work environment claim." *See, e.g., Faragher v. City of Boca Raton*, 524 U.S. 775, 788

(1998) (discussing the Supreme Court's hostile work environment decisions, and stating that a "recurring point in these opinions is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment").

Plaintiff alleged that the following incidents supported his claim for racial harassment: (1) In September 2012, a co-worker referred to his own genitalia; (2) co-workers Jeremiah Gibson (union steward) and Richard Enriques played a radio and listened to Rush Limbaugh; (3) a co-worker told plaintiff a joke that used racially offensive terms; (4) a co-worker had a confederate flag in the rear window of her car and plaintiff was told by his union steward he could put a black panther sticker on his car; and (5) during a grievance hearing after plaintiff was terminated, manager Jerry Wassel told plaintiff he had a "sick mind." (Vol. I, at 44. Pl. Am. Compl.). Plaintiff's racial harassment claim fails as a matter of law.

### 1.    Plaintiff's complaints are not related to racial animus.

To succeed on a racial harassment claim, plaintiff must show that the harassment was racial or stemmed from racial animus. *See Tademy v. Union Pacific Corp.*, 614 F.3d 1132, 1139 (10th Cir. 2008) ("The harassment must be racial or stem from racial animus"); *Walker v. R.L. Brownlee*, 385 F. Supp.2d 1126, 1135 (D. Kan. 2005) (same).

Plaintiff's complaints in this case are unrelated to racial animus.  The sexual comment complained of by plaintiff was not racial.  Plaintiff also cannot show any comments conveyed on the radio stemmed from racial animus.  *See Tademy*, 614 F.3d at 1139.  It is questionable whether plaintiff even subjectively believed that Rush Limbaugh and any language on the radio was offensive, as he never complained to any decision-maker (i.e., Darrell Abels or James Francis).  (Vol. I, at 377, Francis Dec., ¶ 39; Vol. I, at 329, Abels Dec., ¶ 46).

Plaintiff did complain in 2009 that a co-worker had a confederate flag license plate in the rear window of her vehicle.  Mr. Abels investigated the concern, learned that the co-worker "just liked the flag" and she did not intend to offend her co-workers.  (Vol. I, at 326-327, Abels Dec. ¶ 29-30).  Mr. Abels would have taken action against the co-worker had she displayed racially offensive language.  (Vol. I, at 326, Abels Dec. ¶ 30).  Plaintiff only resurrected the flag issue in March 2013 (four years later) *after* his final termination.  Still, he fails to provide any evidence that the mere display of the flag in a car window is racially motivated.   Several courts note that the confederate flag "may also represent southern heritage, the old South, or values of independence."  *See, e.g., Coleman v. Miller*, 885  F.Supp. 1561 (N.D.Ga.1995), *aff'd*, 117  F.3d  527 (11th Cir.1997) (holding state flag which contained symbol used in Confederate battle flag does not violate Title II of Civil Rights Act of 1964 prohibiting discrimination); *see also*

*Erickson v. City of Topeka*, 209 F. Supp. 2d 1131, 1147 (D. Kan. 2002) (rejecting hostile work environment arguments based on employee's confederate flag license plate).

Plaintiff complains that a manager told him that he had a "sick mind." Even if he did, plaintiff referred to himself as a "paranoid schizophrenic." (Vol. I, at 325, Abels Dec. ¶20; Vol. I, at 261, Pl. Dep.). Plaintiff was seen by a licensed psychologist, was compelled to take an anger management course, and was terminated five times for workplace violence. The alleged "sick mind" comment is unrelated to race and too vague to be actionable.

The only arguable racially related comments allegedly heard by plaintiff came in the form of a "Black Panther" comment and ambiguous jokes. The Black Panther comment was made *after* plaintiff's termination and by his own union steward, and merely referenced by Mr. Wassel at a local hearing in an attempt to get plaintiff to understand the difference between workplace violence and a symbol displayed on a personal vehicle. As for the jokes, plaintiff cannot show that they were constant, stemmed from racial animus or that they were unwelcome. *See Bolden v. PRC, Inc.*, 43 F.3d 545, 551 (10th Cir. 1995) (to support a racially hostile work environment claim, "there must be a steady barrage of opprobrious racial comments"). Plaintiff admits that he participated in "off-the-wall jokes." (Vol. I, at 287, Pl., Dep., 196:13-14). According to plaintiff, "when I first met [Jerimiah

Gibson], I thought he was Mexican.  He told me he wasn't no Mexican, but I always joked with him and called him Pedro all the time, but he said he wasn't no Mexican." (Vol. I, at 256, Pl., Dep., 61:7-12).  Plaintiff, therefore, cannot show that isolated and sporadic jokes made by his co-workers were either unwelcomed or stemmed from racial animus.

### 2.    Plaintiff cannot show that the alleged incidents were severe or pervasive.

Plaintiff must show that the environment was both objectively and subjectively hostile or abusive.  *See Harsco Corp. v. Renner*, 475 F.3d 1179, 1187 (10th Cir.2007). Thus, courts must assess "the objective severity of the harassment from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *See id*.  In other words, courts look to a "totality of the circumstances," and "consider such factors as 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Chavez v. New Mexico*, 397 F.3d 826, 832–33 (10th Cir.2005).

In *Bolden v. PRC Inc.*, 43 F.3d 545, 549 (10th Cir. 1995), plaintiff alleged that two co-workers made overtly racial remarks directed at him, and that one of them often used the word nig*** in jokes.  Other co-workers called plaintiff names such as "dickhead," "dumbshit," "asshole," and "fool."  *See id*.  Another co-worker

told plaintiff "to go to hell and he hopes his family goes there with him, along with his dog." *See id*. The court found that the "racial jokes and slurs were infrequent" and thus "insufficient to be actionable." *See id.* at 551; *see also McNeil v. Kennecott Holdings*, 381 Fed. Appx. 791, 792 (10th Cir. 2010) (plaintiff terminated for making threats could not show work environment was hostile despite the fact that the N-word was used repeatedly in the workplace). *See id*. at 793.

Similarly, plaintiff here cannot show that any of the alleged racial harassment was either severe or pervasive. Plaintiff worked for UPS for over 9 years. Yet, he points to only a few unproven vague and isolated alleged comments made over that lengthy time period. Plaintiff's allegations, viewed either alone or collectively, are insufficient to state a claim for a hostile work environment. *See MacKenzie v. City and County of Denver,* 414 F.3d 1266, 1281 (10th Cir. 2005) ("courts judging hostility should filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of . . . jokes, and occasional teasing"). Second, the decision-maker who made the final decision to terminate plaintiff was James Francis, an African American. Plaintiff knew that Mr. Francis and Mr. Abels had authority to address racial harassment. In fact, plaintiff acknowledges that Mr. Abels terminated an employee for referring to plaintiff as "boy," even though plaintiff did not himself hear or complain about the comment.

(Vol. I, at 284, 285).    Yet, plaintiff chose not to make any complaints himself about racial harassment to either Mr. Abels for Mr. Francis.

Third, plaintiff admits that none of his managers or supervisors ever called him any racist names.  (Vol. I, at 317-318, Pl., Dep., 281-282:11).  He also admits that "as long as I was keeping busy, [management] wasn't bothering me."  (Vol. I, at 246-247, Pl. Dep., 29:24-30:6).   He further testified that he "worked good with everybody."  (Vol. I, 306, Pl. Dep. 252:16-22).  Plaintiff, therefore, cannot show that his conditions of employment were altered by his work environment.

### III.   The District Court did not abuse its discretion by denying plaintiff's motion for appointment of counsel.

"A plaintiff asserting an employment discrimination claim has no constitutional or statutory right to appointed counsel."  *Castner v. Colorado Springs Cabelvision*, 979 F.2d 1417, 1420 (10th Cir. 1992).  The district court, however, may appoint counsel for a plaintiff in an employment discrimination action.  *See id*.  Before counsel may be appointed, a plaintiff must make affirmative showings of (1) financial inability to pay for counsel, (2) diligence in attempting to secure counsel (3) meritorious allegations of discrimination, and (4) plaintiff's capacity to present the case without counsel.  *See id*.  This Court "reviews the denial of a request for counsel in Title VII cases and other civil cases under the same standard abuse of discretion."  *Sandle v. Principi*, 201 Fed. Appx. 579, 583 (10th Cir. 2006) (unpublished).

In this case, the District Court did not abuse its discretion.  The District

Court listed and carefully considered all four factors laid out in *Castner*.  The

District Court further reasoned:

> Based on the Court's review of the pleadings filed by Plaintiff
> to date, the Court finds that Plaintiff appears able to adequately
> communicate the facts giving rise to his claims. This case
> involves relatively uncomplicated facts and asserts claims
> against a single defendant. The nature of the factual issues and
> legal issues raised do not appear overly complex. Given the
> liberal standards governing pro se litigants, if Plaintiff devotes
> sufficient efforts to presenting his case, the Court believes
> Plaintiff should be able to adequately prosecute his claims
> without the assistance of counsel.

The District Court's belief that plaintiff could adequately prosecute his

claims was well founded.  Indeed, plaintiff very ably (1) filed a very detailed 20-

page complaint (not including exhibits) asserting claims of racial discrimination;

(2) filed a motion to amend and 29-page amended complaint (not including

exhibits); (3) filed a detailed opposition brief to UPS's motion to dismiss, in which

several of plaintiff's claims survived; (4) participated in and served written

discovery; (5) filed a motion in limine; (6) filed a cross-motion for summary

judgment and reply brief supporting the same; (7) filed an opposition brief

(including citations to case law) to UPS's motion for summary judgment; and (8)

filed a motion to strike certain evidence relied on by UPS.  *Cf. Cookish v.*

*Cunningham*, 787 F.2d 1, 4 (10th Cir. 1986) (appointment of counsel unwarranted

when plaintiff's pleadings were well drafted and plaintiff moved successfully to amend his initial complaint and moved for summary judgment).

The District Court also did not abuse its discretion because the plaintiff's claims of discrimination and harassment were meritless. Plaintiff admitted he was terminated for workplace violence, and admitted that UPS relied on witnesses stating he attempted to fight a co-worker. *See Castner*, 979 F.2d at 1421 ("The indiscriminate appointment of volunteer counsel to undeserving claims will waste a precious resource and may discourage attorneys from donating their time").

Moreover, plaintiff's claims were straight forward, and he had personal knowledge of the material facts, which were largely undisputed. Indeed, most of the evidence involved plaintiff's conduct. *Cf. Moomchi v. Univ. of New Mexico*, 72 F.3d 138 (10th Cir. 1995) (concluding appointment of counsel not warranted when "the legal issues are straightforward" and the facts were generally within plaintiff's personal knowledge). The District Court did not abuse its broad discretion in denying plaintiff's amended motion to appoint counsel.

### IV.    The District Court properly considered UPS's witness statements because plaintiff stipulated to the admissibility of the statements and UPS relied on them to terminate plaintiff.

Plaintiff appears to contend that the District Court improperly considered various witness statements relied on James Francis, the decision-maker, in terminating plaintiff. Plaintiff, however, stipulated to the admissibility of the

27

witness statements. *See* Pretrial Order, doc. 53, ¶ 2. On this basis alone, his contention fails.

Moreover, the statements were admissible because the decision-maker, James Francis, averred that "I relied on witness interviews . . . and witness statements" in terminating plaintiff. (Vol. I, at 376, Francis Dec., ¶34). On this basis, the District Court properly considered the witness statements. *See Zamora v. Bd. of Educ. for Las Cruces Pub. Sch.*, 553 Fed. Appx. 786, 788 (10th Cir. 2014) ("The report is not hearsay because the Board offered it to establish the effect it had on Superintendent Rounds' state of mind when he made the decision to terminate Zamora . . . it was properly considered by the district court"); *Wright-Simmons v. The City of Oklahoma City*, 155 F.3d 1264, 1269 (10th Cir. 1998) (same); *Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1434-35 (10th Cir. 1993) (same).

## V.     The District Court did not abuse its discretion in denying plaintiff's request for default.

The District Court granted UPS a 10-day extension, until July 18, 2013, to file an answer to plaintiff's complaint. *See* Vol. 1, at 21, Order. Plaintiff then requested an entry of default, which the District Court denied "because the time for the defendant to plead or otherwise defend has not expired." *See* Vol., 1, p. 26, Order. UPS subsequently timely filed its answer. *See* Vol. 1, p. 27, Answer. This Court reviews the district court's refusal to grant a default judgment for abuse of

discretion. *Dennis Garberg & Assocs., Inc. v. Pack–Tech Int'l Corp.*, 115 F.3d 767, 771 (10th Cir.1997).

Plaintiff's request for default was meritless. First, UPS timely filed its answer. Second, plaintiff suffered no prejudice. *Gulley v. Orr*, 905 F.2d 1383, 1386 (10th Cir. 1990) ("In light of the strong preference for the disposition of litigation on the merits . . . and the lack of any allegation of prejudice to [plaintiff], the district court did not abuse its discretion in denying [plaintiff's] motion for default judgment"); *Roberts v. Paulson*, 263 Fed. Appx. 745, 748 (10th Cir. 2008) (unpublished).

## CONCLUSION

Plaintiff was given multiple chances by UPS. Nevertheless, four terminations (reduced to suspensions), psychological therapy, and an 8-week anger management seminar did not stop plaintiff from following a co-worker in the night to fight. Plaintiff was lawfully terminated. No reasonable jury would rule in favor of plaintiff. The District Court's judgment should be affirmed.

Respectfully submitted,

ARMSTRONG TEASDALE LLP

BY: */s/ Dione C. Greene*
    Dione C. Greene  KS #23010
    2345 Grand Boulevard, Suite 1500
    Kansas City, Missouri  64108
    816.221.3420
    816.221.0786 (facsimile)
    dgreene@armstrongteasdale.com

    ATTORNEYS FOR APPELLEE
    UNITED PARCEL SERVICE, INC.

## CERTIFICATE OF COMPLIANCE

As required by F.R.A.P. 32(a)(7)(C), I certify that this brief complies with the type-volume limitation of F.R.A.P. 28(b) and 32(a)(7)(C) in that this brief contains 7370 words, excluding the parts of the brief exempted by F.R.A.P. 32(a)(7)(B)(iii).  I relied on my word processing software to obtain the word count and it is Microsoft Word 2010.  This brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2010 in Times New Roman 14.

I certify that the information in this certificate of compliance is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

    */s/ Dione C. Greene*
    Attorney for Appellee UPS

## CERTIFICATE OF DIGITAL SUBMISSION

I, Dione C. Greene, hereby certify that a copy of the foregoing brief, as submitted in Digital Form via the Court's ECF system, is an exact copy of the written document filed with the Clerk and has been scanned for viruses with the Symantec Endpoint Protection version 11.0.4014.26, and, according to the program, is free of viruses.  In addition, I certify all required privacy redactions have been made.

 /s/ *Dione C. Greene*
Attorney for Appellee UPS

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing brief was furnished through ECF electronic service and mailed to the following on this 26th day of February, 2015 to:

> Daniel Wayne Clay
> 712 Chesnut
> Quincy, IL 62301
> APPELLANT

*/s/ Dione C. Greene*
Attorney for Appellee UPS